We'll hear argument first this morning in Case 16-476, Christie v. NCAA, and the consolidated Case 16-477, the New Jersey Thoroughbred Horsemen's Association v. NCAA. Mr. Olson. Thank you, Mr. Chief Justice, and may it please the Court. One of the most important decisions made at the Constitutional Convention in 1787 was replacing the failed confederacy that governed states with a national government that could regulate individuals but not states. In the words of this Court in the New York case, Congress may regulate interstate commerce directly, but it may not regulate states' regulation of interstate commerce. Mr. Olson, isn't that what the government does whenever it preempts state laws and says you can't regulate? When the government preempts state laws, the government or the Federal Government has initially taken the position or taken an action to regulate interstate commerce in some respect, and when it does that, this Court has repeatedly held it may preempt contradictory or inconsistent state laws. So what do you make of FERC? What do you make of FERC? FERC, the government gave the State a choice. Yes. Regulate this way or don't regulate at all. That's right. And we won't either. It gave the States a choice in conjunction with the regulation of the area that was being ---- No, that there were Federal standards. Yes. The States were told accept them or don't. Yes. But if you don't, you won't regulate, neither will we. So ---- As a matter of fact, the consequence of that is that the States could regulate according to the standards established by the Federal Government with respect to the regulation of interstate commerce, and if the States chose not to do that, the field was left to the Federal Government. This is a direct PASPA, is a direct command to the States without any effort to regulate sports wagering. The Airline Deregulation Act is the obvious example. Yes. And the Airline Deregulation Act is a very, very good example because in that case, the Congress of the United States took a wide responsibility with respect to airline deregulation. Airline regulation, as a matter of fact, that statute has a panoply of provisions regulating airlines in various different respects, including ---- No, but suppose they hadn't. I mean, they say, we don't want the price and routes of airlines deregulated, period. We don't want to regulate it. Well, the ---- That's the Federal statute, and it says, now, States, you can't regulate them, and we don't regulate their prices. Free market does. Okay. Here, they say, imagine, I'm naming it. They say, we're not going to regulate sports gambling at all. We're not going to forbid it, and we don't want you or we, you know, we want you to forbid it. I mean, you see the analogy. I do see the analogy. And the Morales case to which you're referring discusses in great detail the Federal regulatory scheme, which included as a portion of the Federal regulatory scheme a preemption of the States from regulating fares, conditions of service, and that sort of thing. But, Justice Breyer, that is an area, it's a quintessential example of the Federal government taking responsibility for how airlines flew in this country and deciding in certain areas, yes, it could be preempted. This statute is completely different. What does that mean? What would you be looking for when you say that the Federal government took responsibility? I mean, suppose that the Federal government had just said, we don't want States to regulate, we don't want to regulate ourselves, we just want, I think this is what Justice Breyer's question was, a free market. So is that enough responsibility that the Federal government has taken? I believe it is not, because that is a situation where the Congress would be saying we're choosing to regulate States. We're telling States that you may not participate in regulating commerce that is taking place in your State. We don't want to take any responsibility. We want to put the burden and expense and accountability all on the States to do so. This is quintessentially what the Congress did here. What I'm asking, Mr. Olson, is you're suggesting that the Federal government, in order to preempt State activity, has to itself enact some kind of comprehensive regulatory scheme. And the question is, you know, what would we be looking for if that were our test? When do we know that they've enacted a sufficiently comprehensive regulatory scheme in order to allow preemption of State rules? The only thing that I would say in response as a predicate to answering your question is when you say sufficiently comprehensive, to the extent that the State, the Federal government, Congress, has taken responsibility to regulate in that field, once it has done so, it can then preempt under the Supremacy Clause inconsistent or contradictory State laws. But the Supremacy Clause is where this preemption all comes from. It requires, it says that the Constitution, statutes, or treaties shall be the supreme law of the land. The Court has construed that repeatedly as saying that. Kennedy. And it doesn't even have to be inconsistent if the Federal government occupies the whole field. Olson. Yes. Kennedy. And it's like Southern Pacific v. Arizona. Olson. A State cannot regulate the length of a freight train simply because this is reserved to the Congress. So that's fairly standard. Could you, in this case, to avoid commandeering concerns, interpret the law as saying that if States do legislate, then they will be preempted? Well, first of all, no, not. I think if I understand your question correctly, Justice Kennedy, is if Congress had taken responsibility to decide to do something about sports wagering by regulating it in some respect or taking responsibility in some respects, and then it could say that where a State is doing something that's inconsistent, then that can be preempted. But the title of this statute says it all, an act to prohibit sports gambling under State law. So what Congress was saying there, and when Congress passed the statute, it had a report from the Congressional Budget Office that specifically said this will have no budgetary impact on the Federal government. Can we interpret that as saying that if you do regulate, then it will be preempted? It may be preempted. Congress, as you know, Congress may adopt a statute that explicitly, expressly preempts or in some cases, impliedly preempts State laws that are inconsistent or in a way that obstructs the accomplishment of the Federal objective. Now, I'm seeing this, I think. Is this your argument? And don't just say yes if it isn't, please. Forget the Airline DERAG Act. It was a bad example for this reason. But I think what you actually say is the Federal government makes a determination of what interstate commerce will be like in respect to this particular item. It can do that, including a determination it shouldn't be. That's a determination. Okay. Once it makes that determination, it can forbid State laws inconsistent with that determination. That's called preemption. But what it can't do is say that our determination is that the States roughly can do it as they want, but they can't do it that way. For to do that is to tell the State how to legislate, in which case it is the State and not the person who becomes the subject of the Federal law. I wish I had said that myself, Justice. But you did say it in New York. I'm trying to get your argument. And my argument is that is my argument, and the Court said it almost the same way in New York v. United States, Congress could preempt State radioactive waste regulation, but the Tenth Amendment limits the power of Congress to regulate in the way it has chosen. In that case, instead of directly regulating, Congress has impermissibly directed the States to regulate. That's New York v. United States. It's the Prince case. And that same language appears in earlier cases. It goes back to 1911 in the Coyle case. Sotomayor, is this a commercial activity by the State? If it's licensing casinos and horse racing, isn't it involved in a commercial activity? Certainly it is a commercial activity when State individuals are engaged in betting on sports, having a sports book. Why isn't it when the State is licensing that? It's making money from the license. It doesn't change the character of the underlying activity. The Constitution ordains who may regulate that commercial activity, presuming that it's interstate commerce. Once that's satisfied. Sotomayor, I have never understood gambling not to be. You have to just watch the lines on the highways coming from all different directions and States going to gambling casinos. Yes. There's no question. Sotomayor, if it is a commercial activity by the State, haven't we already said that the Federal Government can regulate that activity by the State? Yes. In fact, it's. So why is it that telling the States that it can't license, participate in, authorize, or otherwise involve itself in gambling a strict prohibition of a commercial actor? It's a, it's, the question is interstate commerce, and yes, just as the language in the New York case, which I just quoted, Congress may regulate that field. If it does regulate that field, which Congress has not chosen to do in this case, it then can preempt inconsistent State laws. I would quote. Mr. Olson, you have not challenged 3702 subsection 2, have you? 3702, subsection 2 is simply a counterpart to subsection 1. But you didn't challenge it. We challenged the entire statute, but we were not sued under that section. We were sued for violating section, subsection 1. Subsection 2 is another side of the same coin, because subsection 2 says pursuant to law. The law that's referred to in subsection 1, we say, is something that the States can do and the Congress, if Congress chose to prevent it, it would be unconstitutional. But that subsection. But by its terms, though, subsection 2 operates on the individuals and not the State. Only, only if individuals operate pursuant to law, which means pursuant to the State law, which is referred to in subsection 1. This is a little confusing because of the way Congress chose to do it. But the government refers to that as a belt-and-suspenders thing. And what it is, and I sort of accept that, because subsection 2 simply seems to do indirectly what we contend subsection 1 can't do directly under the Constitution. And it's. Ginsburg. One part of subsection 1, it seems, is not challenged either. And that's the ban on the State itself operating gambling concedos. This, this would be something similar, Justice Ginsburg, to the Reno v. Condon case or the South Dakota, I mean, South Carolina v. Baker case, where the Federal government chose to enact a law of general application to, that applied to private States when the States were engaged as a market participant in the same, to the same degree as interstate commerce, in interstate commerce. So to the extent that Congress had initially decided to regulate this area and put itself into the field of regulating private persons engaged in activity, it could then address the States if the States choose to engage in the same activity. Ginsburg. So if you took this statute and you take the prohibition on private parties and you can have a comparable prohibition on the State, what do you accomplish by knocking out the authorized by? If you have two parts that are not constitutionally infirm, they achieve almost the same thing. It would be constitutionally infirm, Your Honor, had, because the State, because the Congress didn't attempt to regulate interstate commerce directly, and it could then, if it did so, which it did not do so, quite obviously, it could then regulate the State as a market participant to the same degree it was regulating private citizens as a market participant. Roberts. This is pretty comprehensive. The comprehensive aspect is a total, total prohibition. Yes, it's comprehensive. So I don't know whether it's you seem to be saying that they can't regulate it if the regulation is going to be a total ban. But that's, that's very comprehensive. No. I agree with the way you stated it, but that is not PASPA. If PASPA said we prohibit sports betting, gambling on sports, then it could address the State as a participant in that same activity. It did not do so. This statute does, attempted to have the States, and that's why I quoted the name of the statute, to prohibit sports gambling. It didn't stop there. It said sports gambling under State law. And what it intended to do, this is what you talked about in the New York case, New York v. United States, is it put the accountability, the expense, the responsibility, the burdens on the States, and basically said, as the, as the Congressional Budget Office says, it won't have any effect on the Federal budget because the Federal Government is doing nothing. It also said in the Senate report it won't have any regulatory impact. Kagan. So suppose I read these cases as setting up a principle that the Federal Government can't conscript State officials for its own purposes. You know, the Federal Government can do whatever it wants, consistent with the Commerce Clause, but it can't conscript State officials in order to do, help them, help the Federal Government do it. If that's the way I see these cases, what's being, who's being conscripted in order to do what here? What is, it's both conscription, and the Court uses the word commandeering. Yes. And directing the States. All of those terms, all of those verbs are applied in this. What is being conscripted here is the legislature of New Jersey has been told that it may not regulate an activity that's taking place in New Jersey, all over New Jersey. It's, there's illegal gambling going on. It can't regulate that activity. The legislature can't. Kagan. I mean, just the way you say that, Mr. Olson, the Federal Government is saying to the States, you can't do something. So that sounds to me the language of preemption all the time. The Federal Government takes some kind of action, passes a law, and then says to the Congress, you can't do anything. Olson. It is so fundamental in the, at the Constitutional Convention, and discussed in most detail in the New York case, that the difference is that in those circumstances where Congress has taken the step of regulating commerce, it can preclude State efforts that interfere with that or conflict with that. But when it sets out at the initiative, at the first stage of regulating the legislature here we have a situation where a court has ordered, pursuant to my opponent's briefs, ordered, told New Jersey, you can't repeal a statute that you've tried to repeal. You have, must keep it on the books. Kagan. So do you see no difference between the Federal Government saying to a State, look, you can't take some preferred policy option that you would like to take, and on the other hand, the Federal Government saying to a State, you must help us do something? Because I thought that our cases were all about the second thing. You must help us. You must be our little assistance when we promote or try to advance a policy objective. And I guess what I'm asking you for is, how is New Jersey being put in that position with respect to this statute? New Jersey, in many ways, New Jersey is being told it may not regulate in the way its legislature chooses to exercise its discretion with respect to an activity taking place in that State. It must enforce a law and keep a law on the books that it has attempted to repeal. The executive branch and the legislative branch of the State of New Jersey have been conscripted.  Mr. Olson, may I just ask you to qualify that can't or must enforce? Because the Third Circuit, the first time around, said each State is free to decide how much of a law enforcement priority it wants to make of sports gambling. So there's no to be a Federal prosecution if the State says, we've got other things to do that are more important than casino gambling or sports gambling. Yes, Justice Ginsburg, the Court said that. And the Court said you may repeal any portion of your statutes. You may take any policy that you want to take. The Federal Government said you may repeal all or any part of your sports betting prohibitions. That's exactly what New Jersey did. But you can imagine, Justice Ginsburg, having a law that a Federal court has ordered New Jersey to keep on the books. It prevents it from repealing that law, which means it's the same as requiring it to enact that law and requiring to maintain that law in the books. And then the officials of New Jersey, the law enforcement people in New Jersey, the governor of New Jersey, saying, well, we're not going to enforce that law on the people of New Jersey. That is a strange, very, very strange construction of what the preemption clause is and commandeering is all about. But to go back to the New York law. Sotomayor I'm sorry. Does the injunction tell the governor that he has to enforce this law? It doesn't. No, it says that the repeal must be reversed. Sotomayor Well, if an act is unconstitutional, those laws basically go by the wayside no matter what. But my question to you is, I don't, I read the injunction. I don't see it anywhere telling the governor he has to enforce these provisions. No, it doesn't. What the governor's responsibility to enforce the law. Mr. Olson, if every governor enforced every law on the book, the state would be more than bankrupt. It would have no way of surviving. I understand that. There are countless laws and even laws that are enforced that are not enforced totally. The states make choices all the time. Yes, and but the states make those choices then. Here we have a There's nothing here telling this state that it has to enforce this law. There's an order from a Federal court saying that the legislature, having repealed a statute, must unrepeal it, put it back on the books, and what you're saying is that the governor doesn't have to enforce that law. It's a law on the books of New Jersey. The governor and executive branch of New Jersey officials have taken an oath to uphold the laws of the state of New Jersey, and here's a Federal court that comes along and basically says we're going to order this statute to be back on the books, but just forget about it. This is a very, very strange situation. Sotomayor What's the difference between that and this law is unconstitutional? This law is preempted or just a simple ruling by the court. This law is preempted, period, end of story. This was a repeal. Sotomayor If, if, if, as I said, the court had simply said this is preempted. And what this is, in your question, is a repeal of a prohibition of sports betting, which means the repeal that the legislature carefully did in response to the Third Amendment. And if you repeal any law, you wish. Sotomayor I have three ways of looking at this case or of the issues here. The first way is to say that this is a repeal, which it seems you're arguing, and you're saying to us, does or does not this statute permit a repeal? And if I say it permits repeals of all kinds, partial or complete, partial or not partial, we avoid the constitutional question, because then you can do whatever kind of repeal you want. The second way to look at this is that the statute does not prevent repeals at all. That's what you're arguing right now. That would make this statute unconstitutional. And the third approach is basically what the government is arguing here, which is it permits complete repeals, but not partial repeals. Because partial repeals of the nature taken here are actually authorizations that are prohibited by the law. So those are the three approaches. Am I missing something in what those approaches are? Yes, because the effect of the statute is to prohibit New Jersey. The statute was intended to ban sports betting. That's the second, or is this a fourth way of looking at it? No, this is a one way, and I submit the only way of looking at the statute. From its title to its legislative history to its exact language, it was intended to prohibit sports betting under state law. That's my second way. Now, sports betting is taking place under state law all over the United States. In every state except Nevada, with these other limited exceptions, is illegal. What New Jersey has decided, not just that we want to repeal, because if you repeal all the problems. You did make the argument below that there was no authorization because the statute didn't regulate how sports betting would take place. You've abandoned that argument on a statutory interpretation ground, and I'm curious why. We only were responding to a arguments by our opponents and a Third Circuit decision that says. But we normally interpret statutes in ways to avoid constitutional difficulties, not in ways to create. Yes. And the only way to avoid that's been suggested here is that there may be some appeals, and the Third Circuit used the language, too much authorization, which is very much like the language in the Prince case, too much policymaking. And the Court said in that case, that's not a line that's permissive with respect to regulating what the States are doing. What we're saying, to the extent that our opponents are making an argument that. But you'd take a win on statutory grounds, wouldn't you? We would take the win, except, Your Honor, the consequence of that is that we would have a statute intending to prohibit the spread of sports betting. And our opponents say, well, in order to make that statute constitutional, because they recognized the commandeering problem right from the beginning, in order to make that constitutional, you will we can allow you to eliminate all prohibitions of sports betting. So an effort by Congress to stop the spread of sports betting would lead to an interpretation in order to hold it constitutional where all limits on sports betting were removed. If the Court permits, I would like to reserve the remainder of my time. Thank you, Mr. Olson. Mr. Clement. Mr. Chief Justice, and may it please the Court. PASPA does three basic things. First, it tells the States that they may not themselves operate or advertise sports gambling schemes, such as a sports-based lottery or a sportsbook. Second, it tells private parties in 37022 that they may not operate or advertise a sports gambling scheme pursuant to State law. And thirdly, it tells States that they may not authorize or license third parties to conduct those sports gambling schemes that would violate Federal law. But it does so by this mechanism. It leaves in place a State law that the State does not want. So the citizens of the State of New Jersey are bound to obey a law that the State doesn't want, but that the Federal government compels the State to have. That seems commandeering. No, Justice Kennedy, we don't think PASPA operates in that way. We think that if New Jersey wants to say, we're going to lift all our prohibitions, we think, at least as to that law, it would not be preempted by PASPA as written. I think it's a separate question, especially in New Jersey, whether the private conduct that would take place pursuant to that repeal, especially at casinos and racetracks, would be prohibited by 37022. Kennedy, But the partial repeal is forbidden, correct? Clement, This partial repeal is forbidden. This partial repeal. But think about how strange. Kagan, What partial repeals are not forbidden? What could the State do? Clement, Well, first of all, I think it's important to recognize that what PASPA regulates, and it does regulate it quite comprehensively, is the operation of sports gambling schemes. It doesn't actually regulate sports gambling in the generic sense, and it says nothing about individuals engaging in sports gambling. So if New Jersey wants to say, look, all our prohibitions, which right now are both on the supply side and the demand side, all of its prohibitions on the demand side, it can partially repeal. Roberts, A State enact a law, the Federal Government enact a law saying no State shall pass an income tax greater than 6 percent? Clement, I think it might be able to do that, because, put it this way, I mean, I don't know why in principle that would be so different from the statute at issue in Baker, which says no State shall issue a bearer bond. Roberts, No State shall issue a bearer bond? Clement, So I think it's the same. But I think to the extent there would be anything odd about it, and it's what Mr. Olson suggests is odd about PASPA, is this idea that there's just a preemption provision. And even he seems to concede that if Congress regulated the field, that there would be no problem with the preemption provision. Roberts, Well, it seems to me that there would be something a little more odd about it, which is it goes to the fundamental powers and prerogatives of a State to sort of function their own government. If you say you can go so far as to regulate what level of income tax they can charge. Clement, Well, you're right, Mr. Chief Justice. I thought you're – and maybe I should amend my remarks to say I don't think there would be a commandeering problem with that statute. Now, there might be some other Federalism problem. You know, I think if the Court – if Congress tells a State to move its State capital, I'm not sure it's a commandeering problem. I just think that it's, you know, I mean, not to use a word maybe I'm not supposed to, but maybe it's a National League of Cities problem, but I don't think it's a commandeering problem. Roberts, Well, you could imagine a situation where it's the same kind of commandeering. The Federal Government wants to reduce expenditures on public employee pensions. So it tells the States, there's a State law, you cannot spend more than 20 percent of your budget on State employee pensions. They're commandeering the State to achieve that result. Can they do that? Clement, Again, I don't think that's a commandeering problem. I do think it's probably a National States League of Cities problem. And, you know, if the Court wants to say that there are certain things that get too far into the Court, the State's kitchen, you know, that's one thing. But I do think that the Chiefs' hypothetical indicates that this blurs political accountability. The citizen doesn't know, is this coming from the Federal Government? Is this coming from the State Government? That's precisely what Federalism is designed to prevent. Clement, And precisely in New York, this Court said there's not an accountability problem with preemptive legislation. And I do think it's worth – just to finish the point, I mean, I do think it's worth recognizing that you have three pieces, three legs of the stool, if you will. One says the States, you can't do this. That, the other side doesn't have an objection to. The other one says private parties, you cannot do this pursuant to State law. That, because it's a regulation of private parties. Kennedy, Are there statutes that rely on a prohibition of State action without an accompanying Federal policy? Clement, Justice Kennedy, I don't know that there are. I actually think maybe there are. It's just that the Federal policy that they enforce is implicit. So there's a provision that says that you can't have discriminatory taxes against railroads. That's all the provision says. I assume in interpreting that you'd think, well, Congress has said they don't want to have that kind of discrimination in interstate commerce. But here, you don't have to look where the Federal policy is. They say, we don't want sports gambling schemes. We don't want the States to do it. We don't want the private parties to do it. It's a certain kind. Roberts, Isn't it enough just to say it's illegal for entities, people or otherwise, to engage in gambling on sports events? That would be the Federal government regulating this area. And then it has what is the normal preemption clause, where it says not withstanding any State law to the contrary. Clement, And, Mr. Chief Justice, I think at the end of the day, that's what PASPA does. I think it was worded in a particular way for a particular reason, which is the one set of Federal statutes you should look at in interpreting PASPA are the pre-existing provisions in Title 18 that already told private parties that if they engaged in a sports gambling scheme or a gambling business in violation of State law, that was already a Federal felony. 1084 of Title 18, 1301 through 1304 of Title 18 as to lotteries and probably most clearly 18 years. Roberts, But that's a very odd way. That's a very odd way. This is, of course, subsection 2. It's a very odd way to phrase something. It's illegal if it's pursuant to State law. In other words, if the State law says you can do it, that's the only situation in which it's illegal. If the State law doesn't say anything about it, well, feel free, you can do it. Clement, But, Mr. Chief Justice, that's why I think the oddity goes away entirely if you understand that before Congress passed PASPA, it was already unlawful as a matter of Federal criminal law for a private party to operate a sports gambling scheme  So in a sense of the law, it's illegal. If the State law says you can do it, that's the only situation in which it's illegal.    illegal. Breyer, In violation of State law. Breyer, I would go back for a second. One of the purposes, which is not the one Justice Kagan mentioned, but it's the best one as this case is concerned that I could find, is the notion that Federal statutes should address themselves to individuals and not to States. All right? Now, that can't be 100 percent true because we have all preemption, but you can still look at it as basically true with preemption being a commerce cause-based, for example, exception. Then ask, what have we here? Well, is there NHTSA, you know, Transportation Safety Act, OSHA? No, nothing like that. There is no Federal regulation of that kind. Is there Deregulation Act, which says it is the Federal policy that there will be free enterprise and fares? No, because all the things you mentioned have the word State law in it. So all we have here are a group, if you like, of provisions, all of which are addressing themselves to what kind of law a State may have without a clear Federal policy that distinguishes between what they want States to do and what the Federal government is doing. Given those circumstances, it falls on the subject matter of this law is the State. That's what this is about, telling States what to do, and therefore it falls within the scope of State commandeering. A little long, but that's how I was reading New York, the notion of not addressing itself to the States, and it's long so that you can answer the whole thing. Well, I'll try to answer the whole thing, but I'll start with the proposition that we know there's absolutely nothing wrong with congressional legislation that operates on States as market actors. And that's what the first four prohibitions in 37021 plainly do. They tell the States you can't operate, advertise, sponsor, or promote sports gambling schemes. So that's okay. It also tells private parties that you can't do those four things pursuant to State law. And keep in mind, those private parties can't do it as a matter of Federal law in violation of State law because it's a Federal criminal prohibition. So all that leaves, then, is the provisions that they've challenged, the license or authorize. And all those are, in the context of this statute, is an express preemption provision, which, of course, it's addressed to the States and local governments, because States and local governments are the ones that can pass laws that might be preempted. But I don't think it creates any problem. Think about it. I think it's very analogous to Baker. In Baker, Congress told the States they couldn't have bearer bonds. They also told private parties, you can't have bearer bonds. Kennedy, but you begin by saying that this is market participant as to the first three, but it's not as to the fourth. Well, it's – I don't mean to be pedantic. It's market participant as to the first four, not to the – not to the fifth and the sixth, which are licensed and authorized. But my point is, you're already telling the States that they can't do something. Just like Congress did in Baker, you can't issue bearer bonds. 37022, especially right against the backdrop of statutes like 18 U.S.C. 1955, tells private parties, you can't issue bearer bonds. You can't operate sports gambling schemes. So the only thing in the middle is a provision that says, States, you can't authorize or license private parties to engage in conduct that violates Federal law. If that provision weren't in the statute, I think these same laws would be impliedly preempted under those that apply implied preemption. And if Congress says expressly those laws, States don't do that, don't authorize and don't license private parties to engage in conduct that would violate Federal law, that's a classic preemption. Roberts. You said subsection 2 is the other side of the coin of subsection 1. And it seems to me that if that's the case, that subsection 2 cannot be severable from subsection 1. Well, I don't know if I used the phrase other side of the coin, Your Honor, but I do think that it is not just severable. I think it operates independently. And it operates without even a constitutional issue. To do the same thing, right? Because it says it is illegal for individuals to follow State law or to engage in activity protected, authorized under State law, which seems to me to be the same thing as saying States shall not authorize individuals to do that. Well, Your Honor, a couple of points. One is, I do think there's some difference in text between 37022 and 37021. And I think there's an argument that the parties haven't had to brief here because this really hasn't been a 3702 case. But I think there's a good argument that 37022 is actually broader and pursuant to law is broader than licensed or authorized by law. So just put that to one side, though. What I would say is, particularly when you read 37022 against the backdrop of the preexisting Federal statutes in Title 18 that made operating a sports gambling scheme in violation of State law a Federal criminal prohibition, then it's a comprehensive scheme. It basically says private parties, there's something that is essentially a cancer on interstate commerce that we don't want to take place. And that is, Mr. Clement. How do we know that Congress would have passed 2 without 1? 1 makes the regulation free because it says States, you have to do this. And it doesn't cause any budget impact on the Federal Government. 2, under your interpretation, is a direct regulation by the Government and therefore might cost money. And you could see a legislature saying, well, you know, 1 makes sense and I'm only going to vote for 2 because of 1, because it's free. It comes for free. So, Justice Gorsuch, I'd like to make two points in response to that. One is, on this idea that the CBO scored it as being 0 and so it's free, we actually looked at other preemption provisions and other Federal criminal provisions, and CBO tends to score them the same way. They basically say that's neither here nor there. My question is, if we're asking the severability question that Chief Justice posed to you, one of the questions we have is what Congress would have done in a different world. Now, that's a very hard question to answer, but that's the question we were posed. And how do we know Congress would have passed 2 without 1, given that 2 in this world, if it's – if 1's fine, 2 comes for free? So, Justice Gorsuch, if I could, I'd like to refine the question in this way, and you tell me it's unfair. But I think really the critical question is, would Congress have wanted to have the first four prohibitions in 1 and the prohibitions in 2 if it couldn't have the license or authorized by law provision? I think that's the relevant question, because their constitutional argument only goes to license or authorized by law. And I think, although all these counterfactual questions are difficult, I think this may be the easiest one that you'll ever have, because I think the statute operates almost the same way. The net effect of a statute that said that States can't sponsor, operate, advertise, promote sports gambling schemes, and neither can private parties pursuant to State law, and by the way, they can't do it in violation of State law because of other provisions, that world, what it would mean is we should have gone for the injunction against the private parties, which, by the way, we did in the district court, and that issue I think is still there in front of the district courts. When we first filed our TRO, we went against the State and we went against the private parties. We got a TRO against both, and then there was an unclean hands argument that arose only with the private parties, so the district court enjoined only the States. But the net effect of these two statutes without authorizer license is the same as a statute that sort of left that to implied preemption. It's essentially the same statute. So I think in the counterfactual world, would Congress want a statute that still told the States that you can't operate or advertise sports gambling schemes and told private parties that you can't operate sports gambling schemes pursuant to State law, and oh, by the way, you can't do it in violation of State law anyways because that violates a whole bunch of criminal prohibitions, obviously they'd want that. You know, this express preemption provision, it's like neat, tidy lawmaking, but it's not vital. Breyer. One sentence answer. In the Airline Deregulation Act, the Congress wanted a world, i.e., the United States, where market forces set prices. In all the acts you're talking about put together, Congress wanted the United States fill in the blank. Congress wanted there to be, putting aside the Grandfather Clause, no State-sponsored or operated gambling taking place by either individuals or by the State. Right. Now, you had to use the word State-sponsored to date that, and as soon as you had to describe it, you had to use the word State-sponsored there. State-sponsored means legislation, and therefore there is no interstate policy other than the interstate policy of telling the States what to do. Can I amend my answer? Yes. Congress in all of these statutes did not want there to be sports gambling schemes operating in interstate commerce. They were indifferent. Congress could have prohibited sports gambling itself. So what Federal policy is served by this statute that would not have been served by the former? Two things, Justice Alito. First is, Congress could have prohibited all sports gambling, but that would have required it to regulate individuals as sports gamblers as opposed to entities, businesses, that were providing sports gambling schemes. All right. So I amend the question. Congress could have prohibited gambling enterprises itself. No question it could have done that, assuming it's within the Commerce Clause. What policy does this statute serve that that would not? Ironically enough, Justice Alito, it actually furthers Federalism values by saying instead of having a one-size-fits-all policy, which says as a matter of Federal law, everybody who operates a sports gambling scheme is going to face two years in the Federal penitentiary and a fine of $10,000, this statute basically says, look, 46 States right now are more or less doing what we want, but they're doing it in 46 different ways. Or does it serve the interest of making it cheap by allowing Congress not to have to expend any funds to enforce its laws? With all due respect, I don't think trying to do this on the cheap was their principal concern. As I said, as a general matter, when Congress passes a new Federal statute, criminal statute, it doesn't really have, like, a big budgetary impact because you don't, like, have to make, like, a new AUSA to enforce that statute. You just let everybody enforce it and the enforcement priorities that Justice Sotomayor alluded to work on the Federal level as well. And if you preempt State law, that tends to not have a budgetary impact either. But what's distinct about this is it basically says, look, 46 States, if you want to regulate this in 46 different ways, have at it. If you want to repeal those laws, I mean, you can do it. I mean, that repeal itself won't violate 37021. The sports gambling that takes place pursuant to it might violate 37022. I actually think that rather than have a one-size-fits-all Federal felony where everybody is going to get the same exact sentence, having a system where, you know, one State makes it a misdemeanor, another State makes it a felony, another State goes at it with all their enforcement policies because they think it's really important. Kagan. What's the line you would draw as between preemption and commandeering? I would draw the line that this Court drew in New York and Prince because it was writing its opinions against the backdrop of all sorts of preemption statutes that various parties were saying were relevant and the Court was distinguishing. I would say that unless the Congress basically tells the States that they must regulate or that they may basically pass Federally prescribed legislation or enforce a Federal policy, as in Prince. Kagan. So what's the difference between saying you must pass a certain piece of legislation and saying you must maintain a piece of legislation on the books? I don't think that there is a distinction necessarily between those two, but I don't think that's what PASPA does. PASPA doesn't say thou must maintain your existing prohibitions on the books. If you think about it. How is it different from that? It's different about that because it basically tells the States, look, you want to repeal that prohibition, you can do that. Your act of repealing the law will not violate PASPA. Okay? I mean, you know, and think about it in analogy to Baker. If a State had a preexisting prohibition on issuing bearer bonds in Baker and it repealed that preexisting prohibition, nothing would happen. If, on the other hand, the State itself started issuing bearer bonds because there's no longer a prohibition or private parties started issuing bearer bonds because there was no longer a prohibition, that action by the State or by the private party would violate the Federal statute. That's the way PASPA works. Alito, could Congress just go through Federal, the statutes of the States and pick out a long list of statutes that can't be repealed except in full? May I answer the question? No, I don't think I could do that, Justice Alito. But again, I think what Congress did here is it said, look, we already say as a matter of Federal law in a variety of provisions that people who engage in gambling businesses in violation of State law violate Federal law. And we now have this prospect that maybe some States are going to authorize this and we are going to complete our Federal policy by saying, look, if you're a private party and you're operating a sports gambling scheme, we don't care if you do it in violation of Federal law, that's criminal, or pursuant to State law that's civilly prohibited by PASPA. I don't think that's a constitutional problem. Thank you, counsel. Mr. Wall. Mr. Chief Justice, and may it please the Court. I think Mr. Olson has boiled down the State's case to what I take to be his two basic arguments. This is a commandeering problem, he says, because New Jersey is forced to keep a law on its books and there's no accompanying comprehensive Federal regime. Both of those arguments are incorrect. As to the first, I'd encourage the Court to look at page 383 of the JA. The injunction in this case does not remotely require the State to keep a law on its books. It says the State cannot give operation or effect to its preempted law. That is exactly, almost word for word, what Justice Scalia said in Prince, the supremacy clause requires. If the State passes a law that is preempted by Federal law, the State can be required and State officials can be required not to give effect to that preempted law. That is not conscription in any meaning of the word. And as to the second, I think this comprehensive Federal regime is a made-up principle for the reasons Mr. Clement gives. A Federal statute often says States may not regulate interstate commerce in a particular way, because the Federal policy is just that the States are to take their hands off of that particular part of interstate commerce. But even if the Court thinks it's a principle, it doesn't need to reach it here, because there is actually a Federal regime beyond PASPA itself. Federal law criminalizes the operation of a gambling scheme that's in violation of State law. So when States in the early 90s started looking at authorizing these things, Congress handled the other half of the circle and said, all right, look, we're not going to make it criminal, but we will give an injunctive action to the Attorney General and the leagues so that if States start authorizing sports gambling schemes, which we know States can't do and we know individuals can't do, and they've never argued there's any constitutional problem with those two legs of the stool, then if States start doing that, we'll give a civil injunctive action, and that's far less invasive of State sovereignty. And I think, look, this is, I mean, as Mr. Flint said, it's a baker all over again. The States can't do it and the individuals can't do it. They've never argued there's any. Sotomayor, can you go back to the basic question? And it was raised, I think, by the dissent, Judge Flint, who said, you start this discussion from the fact that the law exists, if it's a partial or full repeal, then the law doesn't exist, period, end of story. And that's the baseline. So why is a partial repeal unconstitutional or in violation of the preemption clause? Because if the law didn't exist, the fact that they've carved out a certain section of the population for whom the law will stay in existence, that's not actually authorizing. That's just merely repealing. So I think that would be right for a lot of the things that the State would do. But when the State says we're going to repeal our law in such a way that nobody in the State can run a sports lottery or sports book, except for the 12 State licensed casinos and racetracks that already conduct authorized gaming operations. Sotomayor, but that's the issue that the court below avoided. I haven't looked at the licensing laws in New Jersey because they weren't provided to us, and it was further afield than the question presented. But the court below said that it was not passing on that question because it found a different answer. But you might be right if the licenses that those two facilities hold really are general and say you're authorized to do any gambling permitted by law. Then you might have an argument. But if all they do is repeal, what does it matter? So I think it's even simpler than that, Justice Sotomayor. And it gets to something Justice Gorsuch said earlier. They want to interpret the statute as barring all repeals so that they can create a constitutional problem with two words of the statute or law and leverage that to try to take down the entire thing. And our point is pretty simple. If the Court sticks to what it says in Gunther, it says an authorization is affirmative enabling conduct. Then that's this repeal because it channels to particular State licensed providers. But it's not going to be most things that New Jersey does. And read that way, there's no – The Third Circuit said de minimis private gambling isn't covered. On page 30 of your brief, you indicate maybe the State could have a certain dollar threshold and that wouldn't be authorizing. I'm really not clear why that wouldn't be authorizing if you specify a threshold dollar amount in State law. What if they said you can do it at the Elks Club? Is that authorizing? Where does the government draw the line? I think the only thing the Court needs to say here, Justice Gorsuch, is in the context of PASPA, if you – whatever, however the State gets there, legislating up, legislating down, amendment, repeal, enactment, doesn't matter. If what it's doing is channeling sports gambling to particular preferred State preferred providers, that's an authorization. But we have no record about that, as Justice Sotomayor points out. And the Respondent took the position that authorizing means any repeal of any degree, of any kind. Why shouldn't the Respondent have to live with that invited error, perhaps, now in this case? Gershengorn Just, Justice Gorsuch, I don't think it's a record question. I think it's, look, in the 2012 law, they affirmatively said, we're going to let only the casinos and racetracks do it. That was a problem. They didn't dispute that it violated PASPA. Then they came back and said, well, we'll repeal our prohibition, but just for the same casinos and racetracks. And our only point is – Sotomayor I'm sorry, I think the earlier version actually explicitly licensed. It explicitly licensed instead of a complete operation requirements and other things. That, I don't think they would have had a snowball's chance to say that that wasn't licensing or effectively operating. But here what they're saying is there were no laws, there's a law prohibiting all gambling. We're now going to repeal part of it and say some gambling is okay. So – Roberts Unless what the Court wants to say is no repeal can be an authorization, even if New Jersey took away its prohibition only at the Borgata, which would provide a roadmap, I think, for flouting the supremacy clause, because then you could just enact the prohibition and peel it back wherever you wanted. Unless the Court's prepared to say that a repeal can never be an authorization, which I think would elevate form over substance, this particular repeal is. And I think all the Court needs to say is for PASPA purposes, if you're channeling to particular entities here, 12 State-licensed casinos and racetracks, that's an authorization. And read in that way, there's no constitutional problem, because it requires affirmative conduct by the State to enable. It's no longer conscription. We're not telling them they have to maintain anything. The State can sit there and do nothing, and it's perfectly compliant. The one thing – Roberts What if the repeal is across the board, no exceptions? Fisher If New Jersey just repeals its prohibitions, we've said we don't have a problem with that. Roberts Well, is that serious? You have no problem if there's no prohibition at all, and anybody can engage in any kind of gambling they want. A 12-year-old can come into the casino and – you're not serious about that. Fisher I'm very serious about it, Mr. Chief Justice. The problem that Congress was confronting was State-sponsored and sanctioned sports gambling schemes. It didn't care if I bet with my buddy on the Redskins game or we had an office pool. It wasn't going after all sports gambling. Roberts But when you put the State in the position that that's the only thing they can do, that's not a real choice. Fisher Oh, it's not the only thing they can do. They can strengthen or they can repeal in whole or they can repeal in part in various ways. The one thing they can't do is affirmatively engage in the one kind of conduct that Congress took off the table as a policy matter, and that's the definition of preemption. Now, I'll grant that Congress may have assumed this to be the case. Ginsburg Well, the last time around, the government did say in recommending that we deny cert that PASPA does not require New Jersey to retain prohibitions it adopted pre-PASPA. It is free to repeal those prohibitions in whole or in part. That's what the government represented to this Court. Was that statement inaccurate? Fisher No. I think we did not take into account the gamesmanship in which New Jersey was going to engage. We said the same thing we're saying here today, that they've got a lot of options on the table. The one thing they can't do is the one thing that Congress preempted. And so we said they can engage in lots of partial repeals, but we didn't have in mind that New Jersey would come back and do the 2012 law but style it as a partial repeal. And, yes, I wish we had dropped a footnote and said if New Jersey tries to accomplish the same thing but just styles it as something different, that will equally be an authorization for PASPA purposes. And just to return to your question, Mr. Chief Justice, I will completely grant that Congress assumed that states were not going to start authorizing this if they couldn't profit from it. And that assumption was true for a long time. And if states start lifting their prohibitions in whole, I think Congress may well want to revisit that. But PASPA doesn't have anything to say about it. And what New Jersey is doing is giving an unnatural interpretation of Federal statute to create a small problem with two words and then try to leverage that small sickness to take down the entire patient. And that's just not the way statutory interpretation and severability normally work. But they have to do that because it's the only way that can get them where they want to go, which is to take down the private party prohibition in 37022, which they've never argued is even potentially a commentary violation. So it's an authorization, not a repeal, because it's limited to the casinos, which probably have all kinds of other rules and regulations, 9 a.m. opening and da, da, da, da, da. And under those circumstances, it amounts to an authorization, not a simple repeal. Is that the argument? Exactly. If you're trying to figure out what constitutes an authorization to operate a sports gambling scheme, any law that says everybody can't do it except for you two or three, that's an authorization. And it doesn't matter whether the State gets there by legislating up or down. Right. And then there's then, once you say that, I think their argument is. But you see, there is no Federal policy which says States can't no, there is no Federal policy against authorizing sports gambling, but for a Federal policy that says a State can't authorize sports gambling, and that is to commandeer. Have I got that right? I think that is their argument, but I think it doesn't make sense for the simple reason Mr. Clement gave. Baker would not have been different if, in addition to having the prohibition on States and individuals, it had said States are preempted if they try to authorize private conduct that's separately barred by the Act. If this Court finds that to be a latent commandeering violation, the government would respectfully submit. It's going to spend an awfully long time figuring out how to unblur the clear line between preemption and commandeering. Thank you, counsel. Five minutes, Mr. Olson. Olson. Thank you, Your Honor, and may it please the Court. If I've got your argument right just now, just say yes. Otherwise, forget it. You had it right before. No, but I had it right just now. Okay. You weren't late. Forget it. Forget it. Go ahead. Mr. Olson, I do have a question following up on what the Chief asked, sir. The Respondent says that New Jersey legislature is doing exactly what he thinks they shouldn't do or wouldn't do, which is that they are considering legislation that would fully repeal the sports betting prohibitions. I understand it's being considered by both houses. Where does that consideration stand right now? Well, I don't know where it stands, and I think it's utterly irrelevant. The question is the State legislature would do that, but here we have two bills introduced that would do just that. Well, they have not – they're not laws yet. And what I said was Congress could not possibly have intended in a bill to prohibit this expansion of sports betting, to have it construed in a way that would remove all limitations. Let me ask you, what's so crazy about Congress perceiving that States would never want 12-year-olds to go into gambling houses and that the States would find some way of prohibiting that or living with rules of some sort of creating laws, regulations, conduct, that would prohibit that sort of thing? What Congress can do is enact a statute that places restrictions on sports betting and have a finely reticulated statute. It can adopt the provision that it permitted Nevada to have, which is careful regulation of something that's taking place. What we have now is activity that is billions of dollars that is taking place throughout the United States. It is all unlawful. What New Jersey decided to do is – That's your selective – your selective prosecution theory that they're permitting fantasy teams? No, no, no. I'm not talking about fantasy at all. I'm talking about betting on sports games. There are four States that are permitted to continue. Nevada – Nevada has sports betting and it has it regulated. It prohibits criminals from going into the business. It has open books and so forth. Those other three States were small slivers of lotteries. What I'm saying is, and all of the evidence supports this, that betting on sports is taking place all over the United States. Five percent of it is legal in Nevada.  New Jersey decided we are going to – So why don't we – why don't we legalize – this is a hypothetical – marijuana because all of – and all drugs because there's a rampant market out there for those drugs. But we've made a policy choice that we don't want the State involved in promoting that type of enterprise. And the Federal – Why is this – The Congress of the United States enacted laws with respect to marijuana and with respect to other substances. And that's – that's in play right now because various States have done various different things. But we have no question here that what Congress intended to do was pass a law. We'll look at the statute. As I said before, the statute says it's an act to prohibit sports gambling under State law, not under Federal law. The preemption process starts with the idea that there must be a Federal constitutional provision in a statute or in a treaty or in the Constitution, and then the Federal government may take steps to prevent States from interfering with the accomplishment of that. My opponent, Mr. Clement, talked about the – the South Carolina v. Baker case. South Carolina v. Baker specifically said the exact same thing that New York v. United States says, and the Prince case says, Section 310, Regulated States Activities as does not seek to control or influence the manner in which States regulate private parties. And the same thing is true in the – in the Reno case. My opponent talked about statutes of general application. In the last sentence of that case, this Court specifically reserved the question whether Congress could single out States with respect to activities and didn't decide whether it could do so in the – outside the context of a statute of general application. When the – when this suit was first filed by the leagues, their complaint specifically said, PASPA imposes a broad ban on sports betting subject only to the narrow exceptions that apply here. We have an extra couple of minutes. Thank – thank you, Mr. Chief Justice. This is, as the Federal government said on page 15 of the Federal government's that attempt to change what New Jersey has done are nullified by PASPA. Anyone familiar, as this Court is, with the history of the Constitutional Convention knows that it was specifically on the agenda an opportunity for Congress to nullify State laws. That was defeated. The whole debate with respect to Federalism had to do with whether Congress was going to be permitted to regulate interstate – or regulate States, or would it be required to regulate commerce first and as an adjunct to that constrain what States could do. And that's exactly what this statute did to Federal government. The Congress wanted a prohibition under State law because it would have no responsibility, no accountability. And our opponent's brief says, if you're complaining about accountability, call your senator. That's exactly what the United States talked about – what the Court – this Court talked about in New York v. United States. The accountability is very important. The structure is important to the liberty of citizens, and this statute violates that ordained structure. Thank you, counsel. The case is submitted.